**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| **LANDMARK AMERICAN INSURANCE COMPANY,** | ) ) ) | |
| **Plaintiff,** | ) ) | **No.: 1:20-cv-02631-STA-jay** |
| **vs.** | ) ) | |
| **HECO REALTY, LLC and LIBERTY MUTUAL FIRE INSURANCE COMPANY,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
## ORDER DENYING DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Before the Court is Plaintiff Landmark American Insurance Company's Motion for Summary Judgment (ECF No. 50) filed on March 2, 2021. Defendant Liberty Mutual Fire Insurance Company has responded in opposition and filed its own Cross-Motion for Partial Summary Judgment (ECF No. 62). Both parties have fully briefed the issues, and the Motions are now ripe for determination. For the reasons set forth below, Landmark American's Motion is **GRANTED**, and Liberty Mutual's Cross-Motion is **DENIED**.

## BACKGROUND

This declaratory judgment action arises from the parties' dispute over whose policy of insurance provided primary coverage for damage to commercial property in Dyersburg, Tennessee. Both Landmark American Insurance Company ("Landmark") and Liberty Mutual Fire Insurance Company ("Liberty Mutual") issued policies insuring certain risks to the property, albeit

to two different policyholders. Landmark insured the owner of the property, HECO Realty, LLC ("HECO"). Liberty Mutual insured HECO's tenant Renwood Acquisitions, LLC d/b/a Heckethorn Manufacturing ("Heckethorn") and listed HECO as an additional insured. When damage occurred at the property during Heckethorn's tenancy, HECO made claims for the damage under the Liberty Mutual policy and the Landmark policy. Liberty Mutual answered and ultimately agreed to settle the claim with HECO. As part of the settlement, HECO assigned its interests in any recovery under the Landmark policy to Liberty Mutual. Landmark and Liberty Mutual now seek a declaration from the Court about which policy's coverage is primary, among other issues.

To decide the parties' coverage dispute, the Court must first consider whether any genuine issue of material fact exists that might preclude judgment as a matter of law. A fact is material if the fact "might affect the outcome of the lawsuit under the governing substantive law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite particular parts of the record and show that the evidence fails to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1). Local Rule 56.1(a) requires a party seeking summary judgment to prepare a statement of facts "to assist the Court in ascertaining whether there are any material facts in dispute." Local R. 56.1(a). In support of their cross-Motions, both sides have filed their own statements of undisputed facts and submitted responses to the opposing party's statement.

Based on the parties' submissions, the Court finds that the following facts are undisputed for purposes of summary judgment, unless otherwise noted.  HECO leased buildings and real property located at 2005 Forrest Street, Dyersburg, Tennessee, to Heckethorn through August 10, 2019.  (Landmark American's Statement of Undisputed Fact ¶ 1, ECF No. 64.)  Heckethorn took out an insurance policy against certain damages at the leased property.  (*Id.* ¶ 11.)   That policy was issued by Liberty Mutual.  (*Id.*)  Heckethorn was the named insured under the Liberty Mutual policy, and HECO was later added as an additional insured.  (*Id.*)  HECO took out its own commercial property policy through Landmark.  (*Id.* ¶ 12.)  HECO's policy with Landmark insured only HECO and did not name Heckethorn as an additional insured.  (*Id.* ¶ 13.)

Heckethorn's business operations suffered financial setbacks over a period of time, eventually causing Heckethorn to surrender its assets to a secured-creditor, Tenneco Automotive Operating Company, Inc. (*Id.* ¶ 14.)  Tenneco arranged for the removal and sale by auction of all of Heckethorn's machinery, equipment, and other property at the leased premises.  (*Id.* ¶ 15.)  HECO was fully aware of Tenneco's acquisition of Heckethorn's assets and its plan to auction them, including the fact that all of Heckethorn's equipment and trade fixtures would be removed from the leased buildings.  (*Id.* ¶ 16.)  Tenneco retained a third-party vendor to conduct the auction, and the vendor hired a subcontractor to dismantle, disconnect, and remove Heckethorn's property from the buildings on the premises.  (*Id.* ¶ 17.)  At some time in the lead-up to the auction, the subcontractor began its work of removing Heckethorn's business property.  But according to HECO, the subcontractor went further and improperly removed copper wiring and electrical components that were not Heckethorn's property at all, causing extensive damage to HECO's buildings.  (*Id.* ¶ 18.)   An appraisal obtained by HECO set the value of the damage at $2,273,563.13. (*Id.* ¶¶ 20, 21.)

In September 2019, HECO made a claim for the loss of the copper wiring and electrical components, characterized the loss as a "theft," and served notice of its claim on both Landmark and Liberty Mutual. (Landmark's Statement of Undisputed Fact ¶ 19.) On October 6, 2020, after Landmark initiated this action, HECO and Liberty Mutual entered into a settlement, whereby Liberty Mutual paid HECO $1,675,000 as "full compensation under the Liberty Mutual Policy." (*Id.* ¶ 22.) As part of the agreement, HECO assigned to Liberty Mutual whatever rights of coverage it had, if any, under the Landmark policy. (*Id.* ¶ 23.) The Liberty Mutual policy had a policy limit of $12,252,472, so Liberty Mutual's payment to HECO did not exhaust the full limits of its coverage. (*Id.* ¶ 24.)

By and large, the remaining statements of fact submitted by the parties concern the proper construction of the relevant provisions of the lease agreement between HECO and Heckethorn and the policies issued by Landmark and Liberty Mutual. The parties disagree over the correct reading of these contractual provisions and how best to give them effect under the facts of the case. Generally speaking, the construction of contractual agreements presents a question of law for the Court to decide. *Toomey v. Atyoe*, 32 S.W. 254, 256 (Tenn. 1895); *Manley v. Plasti-Line, Inc.*, 808 F.2d 468, 471 (6th Cir. 1987); *see also* 10B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 2730.1 (3d. ed. 2009) ("The legal effect or construction of a contract is a question of law that properly may be determined on a summary-judgment motion when the parties' intentions are not in issue."). As such, the Court will examine the relevant contractual provisions in greater depth as part of its analysis of the legal questions presented for summary judgment.

Landmark now seeks judgment as a matter of law, arguing that Liberty Mutual's policy provides primary coverage for the damages to HECO's property. Landmark takes the position that

the lease agreement between HECO and Heckethorn required Heckethorn to repair damages like those caused by the work of the subcontractor as well as to carry insurance with coverage for such a loss. Heckethorn purchased insurance coverage from Liberty Mutual. Therefore, Liberty Mutual's policy is primary. In support of its position, Landmark cites the features of the lease agreement itself. Not only did Heckethorn have a contractual duty to take out insurance during its leasehold, the lease also required Heckethorn to have HECO named as an additional insured on the policy. The parties agreed that Heckethorn would waive its right of subrogation in favor of HECO and stipulated that any insurance payment for covered losses at the property would be payable to HECO, not Heckethorn. Heckethorn further assumed responsibility for repairs to property damage and the replacement of any property affected by certain risks, including theft. Likewise, the lease provided that Heckethorn would reimburse HECO for any damages caused by the removal of "trade fixtures" on the premises. The parties agreed that HECO would have no liability for any damages caused by the criminal acts of any third party. Each of these lease provisions underscores the fact that Heckethorn was contractually responsible to insure and repair any damages to HECO's property resulting from acts like those of the subcontractor who removed the copper wiring and other electrical fixtures from the premises.

Landmark argues that based on the terms of the lease, Heckethorn also had the sole responsibility for procuring insurance and paying all costs to repair property damage. The lease therefore shifted all risk of loss to Heckethorn. It follows then that Heckethorn's insurance coverage through Liberty Mutual is primary in this case. Because the amount of damage sustained to HECO's property did not exhaust the policy limits of the Liberty Mutual policy, the Court should hold that Landmark has no responsibility to pay or contribute in any way to the payment for HECO's losses.

Liberty Mutual sees things differently.  In its cross-Motion addressed to the priority-of-coverage issue, Liberty Mutual argues that the Court should begin with an examination of each policy, not the lease between Heckethorn and HECO.  Both the Liberty Mutual policy and the Landmark policy provide coverage for the same loss, in this case the alleged "theft" of the copper wiring and electrical fixtures in HECO's buildings.  Both policies contain "other insurance" clauses.  The Liberty Mutual policy's "other insurance" clause states that if there is "any other insurance that would apply in the absence of this policy," the Liberty Mutual policy will only pay for losses that exceed the limits of the other insurance.  In other words, the Liberty Mutual policy is excess to the other insurance, in this case Landmark's coverage.

The Landmark policy's "other insurance" clause contains two parts governing two different scenarios, under both of which Liberty Mutual's coverage would not be primary.  First, in the event there is other insurance, the Landmark policy states that it will only be responsible for its pro rata share of the loss.  The Landmark policy's pro rata coverage, however, only applies where the other insurance is "subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part."  Landmark Policy RM1006 02-11, Ex. B (ECF No. 51-2).  Liberty Mutual contends that this provision applies in this case because both policies, while not identical, cover the same party (HECO), the same risk (damage to HECO's property), and the same interest (HECO's ownership interest in the property).  The Court should therefore construe the Landmark policy to provide pro rata coverage, consistent with this provision of the policy's "other insurance" clause.  And because the Liberty Mutual policy states that its coverage is excess when other insurance is involved, the Court should conclude that Landmark's policy is primary and Liberty Mutual's excess.

6

Liberty Mutual makes an alternative argument addressed to the second paragraph of the Landmark policy's "other insurance" clause. That paragraph states that the Landmark policy will provide excess coverage, should any other insurance cover the same loss or damage, that is, regardless of where the other insurance is not subject to the same plan, terms, conditions, and provisions as the Landmark policy. Liberty Mutual argues that to the extent this provision of the Landmark policy's "other insurance" clause controls, then the Court should find that both the Liberty Mutual policy and the Landmark policy provide excess coverage. Under Tennessee law the policies are mutually repugnant to one another because of this inconsistency, and the Court should therefore hold that both Landmark and Liberty Mutual must provide pro rata coverage for HECO's loss.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment if the party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Supreme Court has stated that "[t]hough determining whether there is a genuine issue of material fact at summary judgment is a question of law, it is a legal question that sits near the law-fact divide." *Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009). In reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court does not engage in "jury functions" like "credibility determinations and weighing the evidence." *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 515 (6th Cir. 2019) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)). Rather, the question for the Court is whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled

to a verdict. *Anderson*, 477 U.S. at 252. In other words, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In this case the Court has subject-matter jurisdiction by virtue of the parties' diversity of citizenship and the amount in controversy. 28 U.S.C. § 1332. A federal court sitting in diversity applies the law of the forum state, including the forum's choice-of-law rules. *Atl. Marine Constr. Co. Inc. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 134 S. Ct. 568, 582 (2013); *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 692 (6th Cir. 2013). In contract cases, Tennessee follows the rule of *lex loci contractus*, meaning that "a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent" such as a valid contractual choice-of-law provision. *Se. Texas Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 672 (6th Cir. 2006) (applying Tennessee law); *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973).

The parties in this case have briefed the substantive law of the state of Tennessee in their motion papers. As in any case where the Court has jurisdiction based on the parties' diversity of citizenship and Tennessee law applies, the Court has as its task to anticipate or predict how the Tennessee Supreme Court would decide the issues based on all of the available data. *Fox v. Amazon.com, Inc.*, 930 F.3d 415, 422 (6th Cir. 2019) (citing *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 607 (6th Cir. 2012)). This includes the published opinions of the Tennessee Court of Appeals. *Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 358 (6th Cir. 2018) (citing

Tenn. Sup. Ct. R. 4(G)(2) for the proposition that a published opinion of the Tennessee Court of Appeals is "controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction"). The Court will assume for purposes of deciding the questions of law presented in the Rule 56 Motions that Tennessee law governs the parties' dispute.

## ANALYSIS

HECO had coverage under both the Landmark policy and the Liberty Mutual policy, and both policies covered the theft or loss of the copper wiring and electrical components from HECO's commercial property in 2019. No party actually disputes these points, at least at this stage of the proceedings. The question for the Court is which insurance company must pay for HECO's covered loss, Landmark or Liberty Mutual or both on a pro rata basis. The parties agree that their dispute is contractual. Under Tennessee law, courts construing the terms of a contract ascertain the intent of the parties based on the ordinary and natural meaning of the words used in the instrument. *Perkins v. Metro. Gov't of Nashville*, 380 S.W.3d 73, 85 (Tenn. 2012); *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008). But before the Court can ascertain the intent of the parties, the Court must first decide which contract(s) should govern: the lease between Heckethorn and HECO (as Landmark contends) or the insurance policies issued by Landmark and Liberty Mutual (as Liberty Mutual contends).

The Court holds that the insurance policies themselves are the proper starting point for ascertaining the parties' agreement concerning insurance, not the lease between Heckethorn and HECO. The Tennessee Supreme Court has held that "[i]nsurance policies are, at their core, contracts," and "questions regarding the extent of insurance coverage present issues of law involving the interpretation of contractual language" contained in the policies. *Garrison v.*

*Bickford*, 377 S.W.3d 659, 663–64 (Tenn. 2012) (citation omitted).  Simply put, Tennessee courts would analyze the priority-of-coverage question by starting with the contractual language of the policies issued by Liberty Mutual and Landmark.  *See Continental Ins. Co. v. Excel Ins. Co.*, 541 S.W.2d 952, 953–54 (Tenn. 1976) (collecting cases addressed to "other insurance clauses" and remarking that their holdings "were based upon the terms of the policies themselves, and not the provisions of any lease agreement between the insured parties").

Landmark's position that the Court should disregard the insurance policies and decide the priority-of-coverage issue *only* with reference to the lease agreement between Heckethorn and HECO runs counter to Tennessee law.  Landmark proposes a clear and unambiguous reading of the lease agreement.  Heckethorn, the tenant, agreed to assume all risk of loss or damage at the leased property and contracted with Liberty Mutual to insure against its losses under an "all-risk" type of policy.  As the Court explains in greater depth below, the insurance contracts do not answer the coverage dispute in this case, and so the lease agreement is ultimately dispositive.  It is just that under Tennessee law an underlying lease may not always be the deciding factor in cases of this sort.  For example, "other insurance" clauses sometimes mesh and may well settle a coverage dispute where two policies would answer for the same loss, regardless of the terms of an underlying contract between the insureds.  But that is not the case here where both the Liberty Mutual policy and the Landmark policy would provide excess only coverage.   And as a matter of Tennessee contract law, courts decide how to give effect to an insurance policy by looking at the policy to ascertain the intent of the parties.  *Perkins*, 380 S.W.3d at 85.

The fact remains that the lease in this instance was, contractually speaking, a meeting of the minds between landlord and tenant.  The lease did not incorporate any terms of the insurance policy held by Heckethorn (the Libery Mutual policy) or HECO (the Landmark policy), and neither

insurance policy incorporated the terms of the lease. Had HECO brought suit against Heckethorn to recover for damages, the lease would no doubt be the correct starting point for the Court's analysis of which party bore the risk of loss at the property. But the dispute in this case is between Landmark and Liberty Mutual, the two insurance companies that extended coverage to HECO for certain losses at its property. The questions of law presented in the cross-Motions for Summary Judgment concern which insurance policy takes the lead in paying for a covered loss where more than one policy provides coverage for the event. Under general principles of contract interpretation, the Court must first examine the agreements between HECO and the insurance companies about the terms and conditions of their coverage.

## I.      Both Policies' Coverage Is Excess Under the "Other Insurance" Clauses

The Court now turns to consider the policy language contained in each insurance contract providing coverage to HECO's property. "If the contract language is unambiguous, then the parties' intent is determined from the four corners of the contract." *Ray Bell Const. Co., Inc. v. State, Tenn. Dept. of Transp.*, 356 S.W.3d 384, 387 (Tenn. 2011) (citing *Whitehaven Cmty. Baptist Church v. Holloway,* 973 S.W.2d 592, 596 (Tenn. 1998)). The issue with respect to the insurance policies is not whether the policies covered the loss at HECO's property; the insurers agree that they did. Liberty Mutual argues that each policy's "other insurance" clause dictates the outcome of the coverage dispute.

Condition Q of the Liberty Mutual policy was an "other insurance" clause, which reads in relevant part as follows: "If there is any other insurance that would apply in the absence of this policy, we will pay for a covered loss only after the limits of all other applicable insurance are exhausted." Liberty Mutual Policy, Condition Q, ¶ 1 (ECF No. 51-2, Page ID 664). The Court finds that Liberty Mutual's "other insurance" clause is clear and unambiguous. Giving the words

11

of the clause their ordinary and natural meanings, the Court construes the Liberty Mutual "other insurance" clause to provide excess coverage where any other insurance also applies to cover the same loss. Therefore, applying the Liberty Mutual "other insurance" clause to the facts of this case, the Liberty Mutual policy, on its own terms, purports to provide excess coverage only after Landmark has paid out its policy limits.

But this does not end the Court's analysis. The Landmark policy contains its own "other insurance" clause. Condition G of the policy's Commercial Property Conditions consists of two numbered paragraphs and reads in full as follows:

> 1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

> 2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

Landmark Policy, Condition G (ECF No. 62-5, Page ID 1286). Each paragraph of the Landmark policy's "other insurance" clause addresses different scenarios and conditions Landmark's coverage where other insurance is also available to answer for a loss. Paragraph 1 of the Landmark policy's "other insurance" clause makes Landmark's coverage pro rata with any other insurance but only where the other insurance was "subject to the same plan, terms, conditions and provisions" as the Landmark policy. Paragraph 2 addresses all other situations and makes Landmark's coverage excess to any other available coverage. The Court will now proceed to construe the two paragraphs in more detail and determine which type of coverage Landmark agreed to provide under the facts presented in this case, pro rata coverage or excess coverage.

The Court begins with Paragraph 1 and its pro rata coverage, limited to scenarios where two specified conditions were satisfied.  The first of these two limiting factors is obviously met in this case: HECO is the Named Insured in the Landmark policy and had other insurance, the Liberty Mutual policy.  Paragraph 1 specifically states that "*You* may have other insurance . . . ."  Landmark Policy, Condition G, ¶ 1 (emphasis added).   Elsewhere, the Landmark policy defined "you" and "your" to refer to the "Named Insured shown in the Declarations."  Landmark Policy, Bldg. & Personal Prop. Coverage Form (ECF No. 62-5, Page ID 1261).  The Landmark policy originally listed The Harry & Jeanette Weinberg Foundation, Inc. as the Named Insured (Page ID 1234) but later added an endorsement effective May 1, 2019 (ECF No. 1229), amending the Named Insured to read "Heco Realty, LLC."  Reading each of these provisions together, the Court finds that the "You" referenced in Paragraph 1 of the Landmark policy's "other insurance" clause is clearly HECO, the policy's Named Insured.  Furthermore, HECO undoubtedly had "other insurance," namely the Liberty Mutual policy in which HECO was listed as both a Loss Payee and an Additional Insured.  *See* Liberty Mutual Policy, Schedule of Mortgage Holders or Loss Payees (ECF No. 51-2, Page ID 714); Additional Insured Endorsement (Page ID 713).

Landmark's coverage will therefore be pro rata and Paragraph 1 of the Landmark policy's "other insurance" clause will apply, if Liberty Mutual's coverage was also "subject to the same plan, terms, conditions and provisions" as the Landmark policy.  Liberty Mutual argues that the two policies in this case were on all fours and provided coverage for the same party, the same property, and the same kinds of risks.  In some respects, this feature of the Landmark policy's "other insurance" clause is similar to the equitable doctrine of contribution. "Contribution among insurers is available where all insurers are equally liable for discharge of common obligation; however, such 'double coverage' only exists where both policies were on

[the] same property, on [the] same interest in property, against [the] same risk, and payable to [the] same parties." 15 Plitt et al., *Couch on Insurance* 218:3 (June 2021 update) (citing *Reliance Ins. Co. v. Liberty Mut. Fire Ins. Co.*, 13 F.3d 982 (6th Cir. 1994)).  Liberty Mutual has support for its position, albeit from another jurisdiction, that courts will compare two policies at this high level of generality, and not drill down into the particulars of the coverages.  "When determining whether insurance plans are subject to the same plan, terms, conditions, and provisions, the test to be applied is not identity in minute particular of the terms, conditions and provisions of each policy, but whether the policies insure the same property, the same interests and against the same risk." *Ocean Harbor Cas. Ins. Co. v. Great Am. E&S Ins. Co.*, 454 F. Supp. 3d 180, 183–84 (E.D.N.Y. 2020) (citation omitted).

Nevertheless, the Court finds this approach unpersuasive, at least under the facts in this case.  While the equities of contribution may warrant a broad or loose reading of the rights and relationship among the parties, as Liberty Mutual argues, the Court's task here is to interpret the contractual language itself.  *TRW-Title Ins. Co. v. Stewart Title Guar. Co.*, 832 S.W.2d 344, 346 (Tenn. Ct. App. 1991) ("As a matter of substantive law, the principle of contribution is founded not upon contract but upon principles of equity and natural justice . . . .").  In this regard, the Court must give effect to the entire contract as written.  *Cocke Cnty. Bd. of Highway Cm'rs. v. Newport Util. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985) (stating that "a contract must be viewed from beginning to end, and all its terms must pass in review, for one clause may modify, limit, or illuminate another").  Treating the two policies as the "same" in only the most abstract terms would fail to give the word "conditions" its ordinary and natural meaning.

Paragraph 1 conditions Landmark's pro-rated coverage to instances where the insured has "other insurance" and the other coverage is "subject to the same plan, terms, conditions and

14

provisions." While the Court could comb through both policies and parse out all of their "terms, conditions and provisions," the Court finds it unnecessary to do so. The Court holds that the Liberty Mutual policy and the Landmark policy are not subject to the same "conditions" because each contains its own distinct "other insurance" clause and lists the clause as one of the "conditions" of the coverage provided in each policy.

A "condition" is commonly understood to mean "[a] future and uncertain event on which the existence or extent of an obligation or liability depends" and "an uncertain act or event that triggers or negates a duty to render a promised performance." Black's Law Dictionary (11th ed. 2019). Both the Liberty Mutual policy and the Landmark policy contained materially different "conditions," limiting each insurer's contractual obligation to provide full coverage under the terms of its policy where "other insurance" was available to the insured. As the Court has already explained, the Liberty Mutual policy's "other insurance" clause is listed as Condition Q, one of the "conditions" to Liberty Mutual's coverage. Condition Q limits Liberty Mutual's contractual duty to provide coverage where there is other insurance and makes the Liberty Mutual coverage excess in that circumstance. By contrast, the Landmark policy's "other insurance" clause, which is Condition G among the policy's Commercial Property Conditions, limits Landmark's coverage where there is other insurance and makes the Landmark coverage either pro rata or excess, depending on the features of the other insurance policy. These differences in the two policies' "other insurance" clauses, which are both described as policy "conditions," mean the Liberty Mutual policy and the Landmark policy do not provide coverage "subject to the same plan, terms, conditions and provisions." As a result, Paragraph 1 of the Landmark's policy's "other insurance" clause and its pro rata coverage does not apply here.

The upshot of this reading of Paragraph 1 of the Landmark policy's "other insurance" clause is that Paragraph 2 must apply in this case. Paragraph 2 clearly and unambiguously states that Landmark will provide excess coverage (1) if there is other insurance and (2) the other insurance is "other than that described in [Paragraph] 1." For the reasons the Court has just outlined, HECO had other insurance through Liberty Mutual, and the Liberty Mutual coverage was not "subject to the same . . . conditions" as the Landmark coverage, specifically the "conditions" applicable where the insured had other insurance. In other words, because there is other insurance in this case and Paragraph 1 of Landmark's "other insurance" clause was not applicable, Paragraph 2 governs how Landmark's coverage interacts with any other insurance coverage. Landmark and HECO agreed in Paragraph 2 that Landmark would "pay only for the amount of covered loss or damage in excess of the amount due from that other insurance," i.e. the Liberty Mutual policy. Therefore, the Court concludes that Landmark's policy provided excess coverage in this case in accordance with Paragraph 2 of Condition G's "other insurance" clause.

## II.       The "Other Insurance" Clauses Are Mutually Repugnant

Having determined that each policy's "other insurance" clause would make its own coverage excess to the coverage provided by the other insurer's policy, the Court concludes that the two contracts cannot be read in harmony. Under Tennessee law, incompatible "other insurance" provisions of this sort do not "mesh" and are regarded as mutually "repugnant." *Shelter Mut. Ins. Co. v. State Farm Fire & Cas. Co.*, 930 S.W.2d 570, 572 (Tenn. Ct. App. 1996). The next question then becomes how to decide the priority-of-coverage issue where the policies themselves do not provide the answer.

Tennessee courts have not directly addressed the question. Tennessee decisional law suggests that proration is the solution. In the context of auto liability insurance policies with

conflicting "other insurance" clauses, there is a line of Tennessee Supreme Court decisions holding "that where there were conflicting or repugnant insurance clauses in two or more policies covering the same risk, the repugnant clauses would be deemed ineffective, and the insurance carriers would be required to prorate the loss according to their respective limits." *Continental Ins.*, 541 S.W.2d at 953 (collecting cases). This authority might suggest by analogy that the equitable solution to the mutually repugnant "other insurance" clauses in this case is to order Liberty Mutual and Landmark to prorate their coverage. This is exactly one of the alternative outcomes Liberty Mutual seeks in its Cross-Motion for Summary Judgment.[1] Still, the Tennessee Supreme Court has never held that its reasoning in this line of cases should also apply to other types of property and casualty insurance like the commercial policies issued by Liberty Mutual and Landmark.

What is more, the *Continental* rule is not the final word on the priority-of-coverage question under Tennessee auto liability insurance law. The Tennessee Court of Appeals has noted that after the Tennessee Supreme Court's rulings on the cases cited in *Continental*, "the Tennessee General Assembly enacted legislation which superseded the court's decisions." *Shelter Mut. Ins. Co.*, 930 S.W.2d at 574. Tenn. Code Ann. § 56–7–1101 now addresses priority of auto liability insurance coverage when two or more policies provide coverage "arising out of the use of a motor

---

[1] Liberty Mutual cites *United Servs. Auto. Ass'n v. Hartford Acc. & Indem. Co.*, 414 S.W.2d 836 (Tenn. 1967) as authority supporting its position on proration. However, as the Court discusses in more detail below, the Tennessee Court of Appeals has recognized that *United Services* and other decisions of the Tennessee Supreme Court on proration have since been superseded by statute. *Shelter Mut. Ins. Co.*, 930 S.W.2d at 574. As a result, the *United Services* case has limited precedential value for this point of law. Liberty Mutual also cites the Sixth Circuit's decision in *Prestige Casualty Co. v. Michigan Mutual Insurance Co.*, 99 F.3d 1340 (6th Cir. 1996) as support for its position in favor of proration. While *Prestige Casualty* does stand for the proposition for which Liberty Mutual cites it, the Court of Appeals in that case was applying Michigan law, not Tennessee law. *Prestige Cas.*, 99 F.3d at 1353 (citing *Zurich–Am. Ins. Co. v. Amerisure Ins. Co.*, 547 N.W.2d 52, 59 (Mich. 1996). Whatever persuasive value it may have, the *Prestige Casualty* decision is not binding where, as here, Tennessee law applies.

vehicle." Tenn. Code Ann. § 56–7–1101(a). Tenn. Code Ann. § 56–7–1101(c) specifically governs coverage priority for leased vehicles and provides as follows: "When a claim arises out of the operation of a motor vehicle that is leased under a written lease agreement, and pursuant to which agreement the lessee provides coverage for the vehicle, then any other coverage that may be available for the vehicle through the lessor is not applicable unless and until the limits of all coverage provided by the lessee for the vehicle first are exhausted." In other words, Tenn. Code Ann. § 56–7–1101(c) requires a court to look to an underlying lease and makes the lessee's coverage primary and the lessor's excess, regardless of the policy language found in the insurance contracts, where the lease itself requires the lessee to take out coverage for the vehicle. In this case the lease between HECO and Heckethorn required Heckethorn to procure commercial property insurance for the leased property. So borrowing the analogy from Tenn. Code Ann. § 56–7–1101(c), Heckethorn's coverage, that is, the Liberty Mutual policy, would provide primary coverage for HECO's covered losses.

At the end of the day then, the Tennessee caselaw, which has since been superseded by statute, suggests one result (proration of coverage) while the Tennessee code section points to a different outcome, that is, primary coverage afforded by the lessee's insurance, here Heckethorn's policy with Liberty Mutual, rendering HECO's policy with Landmark excess only. And the fact remains that this authority addressed a very different kind of insurance product, auto liability insurance. Whatever features an insurance contract for auto liability coverage may share with an insurance contract for commercial property losses, the two types of insurance, the underwriting involved in making the policies, and the terms and conditions of coverage for each are not altogether similar. So whatever persuasive value Tennessee law on auto liability insurance may

have, it is persuasive only by analogy and in no way dispositive of the coverage dispute in this case.

### III.    The Lease Agreement Controls Priority of Coverage

The Court's task is to predict how the courts of the State of Tennessee would decide the priority-of-coverage issue based on all available data. *Fox*, 930 F.3d at 422. Because neither the insurance contracts nor the Tennessee courts have answered the specific question presented, the Court is left to apply equitable principles informed by the insurance law of Tennessee and other jurisdictions. "Courts consider the equities in resolving insurance-allocation disputes." *Wal-Mart Stores, Inc. v. RLI Ins. Co.*, 292 F.3d 583, 592 (8th Cir. 2002) (applying Arkansas law); *see also Health Cost Controls, Inc. v. Gifford*, 239 S.W.3d 728, 730 (Tenn. 2007) (noting that "subrogation is an equitable doctrine designed to prevent insured parties from being unjustly enriched by a double recovery"); *Baxter v. Smith*, 364 S.W.2d 936, 939 (Tenn. 1962) (noting that contribution is an "equitable doctrine" based on one party's satisfaction of a common obligation or liability).

Based on its searching review of the available authority, the Court predicts that if confronted with this issue, the Tennessee courts would next look to the terms of the lease between HECO and Heckethorn to ascertain which policy should have priority. A highly persuasive line of cases has concluded that "an indemnity agreement between the insureds or a contract with an indemnification clause . . . may shift an entire loss to a particular insurer notwithstanding the existence of an 'other insurance' clause in its policy." 15 Plitt et al., *Couch on Insurance* § 219:1 (June 2021 update).[2] One of the leading cases for this proposition is the Eighth Circuit's decision

---

[2] The Tennessee Supreme Court has frequently cited *Couch on Insurance* as an authoritative treatise on a number of topics in insurance law, though never for the exact proposition relevant to this case. *E.g. Indiv. Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn.*,

in *Wal–Mart Stores Inc. v. RLI Ins. Co.,* 292 F.3d 583 (8th Cir. 2002). In that case, Wal-Mart had an agreement to sell halogen lamps distributed by another company, Cheyenne. As part of its contract with Wal-Mart, Cheyenne agreed to indemnify the retailer "from any liability resulting from its sales of the lamps" and to maintain $2 million in liability insurance coverage. *Wal-Mart Stores*, 292 F.3d at 585. Cheyenne had $1 million in coverage from a primary insurer and $10 million in coverage from RLI Insurance as part of a second layer of liability coverage. When a Wal-Mart customer suffered injuries from a defective Cheyenne lamp and brought suit against the store, Wal-Mart settled the claim for $11 million. Cheyenne's first-layer insurer paid out its policy limit of $1 million toward the settlement. RLI Insurance, Cheyenne's second layer insurer, and National Union, Wal-Mart's liability insurer, disagreed over which policy should cover the remainder of the settlement.

The Eighth Circuit concluded that RLI Insurance was responsible for the balance of the settlement. The court began its analysis of the priority question by examining the "other insurance" clauses of each insurance policy. *Id*. at 586 ("Insurance policies are contracts, and so, as with any contract, we begin our analysis with the language of the agreements."). Based on a plain reading of the policy language, the court concluded that each policy afforded excess coverage where other insurance covered the loss. Faced with a situation where the insurance contracts themselves did not supply the answer to the priority-of-coverage question, the Eighth Circuit concluded that Wal-

---

*Inc.*, 566 S.W.3d 671, 701 (Tenn. 2019); *Martin v. Powers*, 505 S.W.3d 512, 519 (Tenn. 2016); *Harris v. Haynes*, 445 S.W.3d 143, 149 n.11 (Tenn. 2014); *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 530 (Tenn. 2012) (Koch, J., dissenting). The fact that the Tennessee Supreme Court has cited *Couch* so often in deciding insurance disputes suggests to this Court that it would at the very least consult *Couch* in making a determination of the coverage dispute in this case.

Mart's indemnity agreement with Cheyenne decided the outcome.  *Id*. at 587.  The Eighth Circuit did not lay down a bright-line rule.  *Id*. at 588 ("This is not to say, however, that indemnity agreements always govern insurance-allocation issues.").  Acknowledging that the relevance of an indemnity agreement depends on "the particular facts of the case, such as the intentions and relationships of the parties," the court of appeals gave three reasons to support its decision to give effect to Wal-Mart and Cheyenne's indemnity agreement.  *Id*. at 588–89.

First, the indemnity agreement reflected the relationship or intention of the parties. Cheyenne agreed to indemnify Wal-Mart from any liability, and its insurance with RLI covered the settlement for the injuries and Cheyenne's duty of indemnification.  The intention of the insureds, even if one insured was not a party to the insurance coverage dispute, can properly "prevent[] the indemnitee's insurer from being liable for a settlement arising from a covered loss." *Id*. at 589 (citing *Continental Cas. Co. v. Auto-Owners Ins. Co.*, 238 F.3d 941 (8th Cir. 2000)). Second, Cheyenne's policy with RLI named Wal-Mart as an additional insured.  Shifting the duty to cover the settlement to Wal-Mart and its other insurer National Union would in effect make Wal-Mart liable to its own insurer, RLI.  *Id*. at 593. Third, any other outcome would only result in "circuitous litigation," in which RLI would inevitably cover the remaining $10 million in the settlement.  *Id*. at 594.  If Wal-Mart (or its own insurer National Union, standing in Wal-Mart's shoes) brought suit against Cheyenne to enforce the indemnification agreement, Cheyenne would look to RLI to cover the indemnity.  In this scenario, the indemnity agreement would eventually require RLI to cover Wal-Mart's settlement over Cheyenne's defective lamp, "reveal[ing] the true nature of the parties' obligations and relationships with each other." *Id*.

The Eighth Circuit's analysis in *Wal-Mart Stores* has since been adopted in other circuits and under the law of several states.  *Am. Indem. Lloyds v. Travelers Prop. & Cas. Ins. Co.*, 335

F.3d 429, 436 (5th Cir. 2003) ("As noted in *Wal–Mart* . . ., the clear majority of jurisdictions recognizes the foregoing exception and gives controlling effect to the indemnity obligation of one insured to the other insured over 'other insurance' or similar clauses in the policies of the insurers, particularly where one of the policies covers the indemnity obligation. We believe Texas would follow this well recognized exception to the general rule."); *St. Paul Fire & Marine Ins. Co. v. Am. Intern. Specialty Lines Ins. Co.*, 365 F.3d 263, 270 (4th Cir. 2004) (following *Wal-Mart Stores* and predicting that under Virginia law "the indemnification provisions control the allocation of liability between the insurers in this case . . . ."); *Chandler v. Liberty Mut. Ins. Grp.*, 212 F. App'x 553, 557 (6th Cir. 2007) (holding that under Kentucky law, a court should "consider an indemnity agreement in assigning the priority of liability among overlapping insurance policies"); *Endurance Am. Specialty Ins. Co. v. Victory Park Capital Advisors, LLC*, No. 18 C 08399, 2019 WL 2121118 (N.D. Ill. May 15, 2019); *Star Ins. Co. v. Cont. Resources, Inc.*, 89 F. Supp. 3d 1015, 1029 (D.N.D. 2015); *St. Paul Fire and Marine Ins. Co. v. Lexington Ins. Co.*, No. 05-80230-CIV, 2006 WL 1295408, at *4 (S.D. Fla. Apr. 4, 2006); *Pacific Life Ins. Co. Ltd. v. Liberty Mut. Ins. Co.*, No. Civ.A. 203CV838-A, 2005 WL 1801602 (M.D. Ala. July 28, 2005); *Chubb Ins. Co. of Canada v. Mid–Continent Cas. Co.,* 982 F.Supp. 435, 438 (S.D. Miss. 1997); *West Bend Mut. Ins. Co. v. MacDougall Pierce Const., Inc.*, 11 N.E.3d 531, 547 (Ind. Ct. App. 2014) ("The parties' rights and liabilities to each other were outlined contractually by the terms of indemnification. Once that determination was made, then the insurance coverage issues could be resolved."); *Federal Ins. Co. v. Gulf Ins. Co.*, 162 S.W.3d 160, 165 (Mo. Ct. App. 2005); *Rossmoor Sanitation, Inc., v. Pylon, Inc.*, 532 P .2d 97 (Cal. 1975).

The Court finds that the Eighth Circuit's decision in *Wal-Mart Stores* is persuasive and consistent with principles of Tennessee contract and insurance law.  Just as in *Wal-Mart*, the

insurance policies do not resolve the priority question because they contain mutually "repugnant" "other insurance" clauses.  *Shelter Mut.*, 930 S.W.2d at 572.  Tennessee courts would resolve this impasse and allocate the insurance under equitable principles.  *Wal-Mart Stores*, 292 F.3d at 592 ("Courts consider the equities in resolving insurance-allocation disputes.").  And just as in *Wal-Mart Stores*, the insureds, HECO and Heckethorn, had an underlying agreement in which Heckethorn assumed the responsibility to insure against certain losses.  The Tennessee Supreme Court has recognized that parties may contract for indemnification and held that such a contract is enforceable.  *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 892 (Tenn. 2002) ("This Court has consistently recognized that the right of parties to allocate liability for future damages through indemnity clauses, generally, is not contrary to public policy."); *Lusk v. Jim Walter Homes, Inc.*, 648 S.W.2d 935, 939 (Tenn. 1983) ("Contracts of indemnification may be express, or an obligation to indemnify may arise by implication from the relationship of the parties."); *Tenn. Farmers' Mut. Ins. Co. v. Rader*, 410 S.W.2d 171, 173 (Tenn. 1966).

Although the Tennessee courts have not squarely addressed the specific issue presented in *Wal-Mart Stores*, the Tennessee legislature has, at least in the context of auto coverage.  Tenn. Code Ann. § 56–7–1101(c) already requires a court to look beyond the express terms of insurance policies and treat a lessee's insurance as primary where an underlying lease required the lessee to insure the property.  Looking to the underlying lease agreement and the relationship between Heckethorn and HECO is therefore consistent with Tenn. Code Ann. § 56–7–1101(c).  Furthermore, two federal courts sitting in Tennessee have decided insurance coverage disputes like the one in this case by considering an underlying lease agreement with an indemnification clause.  In *RBP, LLC v. Genuine Parts Co.*, No. 1:04-cv-01154-T/An, 2006 WL 8435065 (W.D. Tenn. Aug. 7, 2006) (Todd, C.J.), another member of this Court relied on the terms of an

23

underlying lease for commercial property to determine which policy provided priority coverage. The facts of *RBP* bear a remarkable similarity to the facts here. Both cases involve a commercial real estate lease where the landlord and tenant agreed the tenant would take out insurance to protect the landlord's property. Both cases involve a landlord who took out a separate policy to insure the same property, despite the coverage procured by the tenant. And the "other insurance" clauses in both cases are largely identical. The court in *RBP* first analyzed the contractual language of the insurance policies, specifically each policy's "other insurance" clause, and concluded that the clauses were inconsistent and did not "mesh." *RBP*, 2006 WL 8435065, at *7. The *RBP* court eventually considered the terms of the lease to arrive at its determination of the priority issue, predicting that Tennessee courts would take the same approach. Based on the relationship of the parties as evidenced in the lease, the *RBP* court concluded that the tenant's insurance coverage was primary.

Likewise, in *Fireman's Fund Ins. Co. v. St. Paul Fire & Marine, Ins. Co.*, 182 F. Supp. 3d 793, 818 (M.D. Tenn. 2016), the Middle District of Tennessee relied on the terms of an underlying equipment lease to decide an insurance coverage dispute where two policies covered the loss but also contained "other insurance" clauses. Unlike *Wal-Mart Stores* or *RBP*, the *Fireman's Fund* court did not construe the insurance policies at all but went directly to the lease's indemnity provisions to decide which policy had priority. The Court finds that both *RBP* and *Fireman's Fund* arrived at similar results and offer strong support for the Court's conclusions about how Tennessee law would view the priority-of-coverage issue in this case.

For the same reasons that the indemnity agreement in *Wal-Mart Stores* answered the allocation question in that case, the lease agreement between Heckethorn and HECO answers the allocation question here. The lease agreement reflects the intentions of tenant and landlord that

the tenant (Heckethorn) and its insurer (Liberty Mutual) shoulder the risk and liability of loss at the leased property.  Heckethorn had a contractual duty to obtain liability insurance for the property, waived any right it had to any insurance proceeds in the event of a loss, and named HECO as an additional insured on any policy Heckethorn took out.  Section 7 of the lease agreement was titled "FIRE INSURANCE" and required Heckethorn to procure property insurance "against loss or damage by fire and such other risks and hazards as are insurable under present and future standard forms of fire, rent, and extended coverage insurance policies, in an amount sufficient to prevent [HECO] from becoming a co insurer under the terms of the applicable policies, and at a minimum in an amount not less than the full insurable value of the Premises . . . ."  (Lease, section 7, Aug. 5, 1996, ECF No. 51-1, Page ID 525.)  The lease agreement further provided that Heckethorn's policy should list HECO as an "Additional Insured" and required that any recovery "shall be paid solely to Landlord."  (*Id*.)  Heckethorn waived its insurer's rights of subrogation against HECO for any loss insured by Heckethorn under the terms of the lease. (*Id*.)

Likewise, the lease agreement provided that Heckethorn was solely responsible to repair any damages (or replace damaged property) resulting from certain losses, including theft, during its tenancy.  Section 13 "REPAIR/REPLACEMENT/MAINTENANCE," part (a), of the Lease states "[Heckethorn] shall be responsible for 100% of the repair, replacement, and maintenance of the Premises, and bear the entire cost of so doing by paying directly for the same."  (*Id*., § ¶ 13(a), Page ID 532-33.)   Under the section of the lease agreement "Limitation of Landlord's Duties," the parties agreed that HECO "shall not be responsible or liable in damages . . . [:D]. "for any acts

or omissions of co-Tenants or other occupants of the building, or for losses by theft" and [E.] for criminal acts, if any, of third parties to, in, or near the Premises." (*Id*., Page ID 533.)[3]

There is no genuine dispute between the parties about the proper reading of these provisions of the lease agreement. Heckethorn, as tenant, agreed to bear responsibility for specified damages that might occur at the leased premises. Heckethorn also agreed to obtain liability insurance, coverage Heckethorn purchased from Liberty Mutual, and to name HECO as a loss payee, at first, and later an additional insured. In other words, it was the intention of Heckethorn and HECO that Heckethorn indemnify HECO for any damage at the leased property and that HECO receive the benefit of commercial liability insurance to cover certain losses at the property. The agreement between Heckethorn and HECO to allocate risk in this way and Liberty Mutual's policy insuring Heckethorn and HECO against the risk suggests that Liberty Mutual's policy should respond to the loss first. The Court concludes that the lease agreement and the relationship among the parties controls the priority-of-coverage question presented in the Rule 56 motions. Because Heckethorn procured insurance coverage through Liberty Mutual and had

---

[3] Elsewhere, the lease defined "Trade Fixtures" to include those "'fixtures' (i) affixed or attached by Tenant, (ii) unique to Tenant's particular type of business at the Premises, and (iii) not common to or generally found in commercial rental property[.]" (Landmark's Statement of Undisputed Fact ¶ 16). The lease specified that if Heckethorn removed "Trade Fixtures," Heckethorn was required to "reimburse Landlord for all such damage not repaired" and HECO was entitled to have the "Premises restored to its condition before trade fixture removal, normal wear and tear excluded." (*Id.* at 16-17.) Landmark has cited these lease provisions as additional support for its position on the role the lease must play in deciding which insurance company must provide priority coverage. The Court notes these features of the lease for the record. However, it is not clear to the Court that the copper wiring or any other electrical fixture removed from the premises would meet the lease's definition of a "Trade Fixture." Neither party has presented any evidence on that point. Moreover, the Court finds that Heckethorn's contractual duty to pay for damage associated with the removal of a "Trade Fixture" has little relevance to whether Liberty Mutual or Landmark should pay for the losses at issue.

HECO listed as an additional insured under the Liberty Mutual policy, all in accordance with the lease, Liberty Mutual's coverage is primary.

To avoid this result, Liberty Mutual raises two additional points, neither of which the Court finds convincing. First, Liberty Mutual argues that the lease required Heckethorn to take out fire and extended coverage, a specific kind of liability insurance, but not coverage for incidents of theft at the property. According to Liberty Mutual, this feature of the lease distinguishes it from the leases at issue in *RBP* and *Fireman's Fund*, where both leases specifically required the lessee to insure against the risk of loss that actually occurred in those cases. Landmark counters by citing evidence in the lease that the policy contemplated was an "all-risk" policy. The Court finds it unnecessary to resolve the question of whether Heckethorn agreed to take out an insurance policy specifically covering theft. The fact is Heckethorn purchased a policy from Liberty Mutual that did cover theft and further agreed to indemnify HECO for damages like those that occurred at the property. Liberty Mutual admits as much. *See* Liberty Mut.'s Mem. in Opp'n 1 (ECF No. 62-1) ("Landmark and Liberty Mutual both issued all-risk property insurance policies covering the same Dyersburg, Tennessee property.") Whether the incident is characterized as theft or some other intentional act, Liberty Mutual agreed to cover the damage (and has now settled the claim with HECO) and does not dispute that both policies covered the damage. The Court finds this argument to be without merit.

Second, Liberty Mutual argues that if the Court does find that the lease controls the order of coverage, the Court should grant Liberty Mutual the opportunity to pursue additional discovery under Rule 56(d). Specifically, Liberty Mutual believes Landmark's underwriting file is relevant and would show whether Landmark considered Liberty Mutual's policy or the existence of the lease when it issued its policy. Federal Rule of Civil Procedure 56(d) allows a non-moving party

at summary judgment to "show[ ] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). A court presented with a Rule 56(d) motion has three options: "(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). A court should consider the following factors in determining how to proceed: "(1) when the issue arose; (2) whether the discovery might change the summary judgment ruling; (3) the time for discovery already allowed; (4) any delay in seeking the discovery; and (5) the responsiveness of the other party to prior discovery requests." *Helena Agri-Enterprises, LLC v. Great Lakes Grain, LLC*, 988 F.3d 260, 273 (6th Cir. 2021) (citing *Doe v. City of Memphis*, 928 F.3d 481, 491 (6th Cir. 2019)).

The Court finds no reason to allow the additional discovery Liberty Mutual seeks. It is true that the parties have filed their competing Rule 56 Motions early on in the case, less than three months after the Court entered the initial case management order and well before the initial deadline for completing all discovery. Still, the issues presented in the parties' cross-motions for summary judgment are almost entirely questions of contract interpretation. Under Tennessee law, the proper interpretation of a contract is a question of law for the Court to decide. *Toomey*, 32 S.W. at 256. Liberty Mutual questions whether Landmark took Liberty Mutual's coverage or the underlying lease into account when it issued HECO its policy. But Liberty Mutual has not shown why Landmark's underwriting would change the Court's interpretation of the relevant policy language or the role of the underlying lease in deciding the priority or allocation issue. Liberty Mutual cites to a single statement from the *Fireman's Fund* case in which the Middle District of Tennessee remarked, "there is no evidence that the insurance premium paid by Lucky Star to Fireman's Fund was calculated based on its being excess to any other insurance coverage, and no

28

evidence that Fireman's Fund was aware that the Leased Equipment was also covered by a policy procured by SCP." *Fireman's Fund Ins. Co.*, 182 F. Supp. 3d at 822.   In context, the *Fireman's Fund* court made the statement to address one of the insurer's contentions in that case that its policy should be designated as "excess" only. *Id.* ("Fireman's Fund's obligation under the Lucky Star Policy is governed primarily by [an equipment lease], irrespective of whether Fireman's Fund's policy is designated as 'excess' as opposed to 'primary.'").   Nothing in *Fireman's Fund* suggests that the relationship between the insurers, both of whom provided coverage for the loss in that case, or the subjective understanding of one insurer about its role vis-à-vis the other insurer in anyway informed the court's interpretation of the lease.   And as the Court has already noted, *Fireman's Fund* did not actually construe the relevant provisions of the insurance policies. Without more, Liberty Mutual has not shown why Landmark's underwriting would alter the result of the Court's summary judgment ruling.   Therefore, Liberty Mutual's request for additional discovery related to Landmark's underwriting must be denied.

## CONCLUSION

The Court holds that Landmark is entitled to summary judgment on its claim that it "is not liable as an insurer of HECO for any loss/damage caused by the Alleged Theft."  Landmark's Br. In Support 2 (ECF No. 51).   Therefore, Landmark's Motion for Summary Judgment is **GRANTED**.  Because Liberty Mutual's policy provides primary coverage, Liberty Mutual is not entitled to judgment as a matter of law on its claims that Landmark's policy is primary and Liberty Mutual's excess, or in the alternative, that both policies should be prorated.   Therefore, Liberty Mutual's Cross-Motion for Partial Summary Judgment is **DENIED**.

**IT IS SO ORDERED**.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE

Date: August 11, 2021.